

1 | BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

2 | DAVID R. CALLAWAY (CABN 262489)
3 | Chief, Criminal Division

4 | DAMALI A. TAYLOR (CABN 262489)
WILLIAM FRENTZEN (LABN 24421)
5 | Assistant United States Attorneys

6 | 450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
7 | Telephone: (415) 436-7200
FAX: (415) 436-6753
8 | William.frentzen@usdoj.gov

9 | Attorneys for United States of America

10 | UNITED STATES DISTRICT COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

12 | SAN FRANCISCO DIVISION

13 |

14 | IN RE: CRIMINAL COMPLAINT ) AFFIDAVIT OF SPECIAL AGENT DAVID
) VANDERPORTEN IN SUPPORT OF COMPLAINT
15 | )
) FILED UNDER SEAL
16 | )
17 | )
18 | )
19 |

20 | 1. I, David VanderPorten, Special Agent with the Federal Bureau of Investigation, being

21 | duly sworn, depose and state that:

22 | **I. BACKGROUND**

23 | *A. INTRODUCTION*

24 | 2. I submit this affidavit in support of a criminal complaint and arrest warrants for Wing Wo

25 | MA, Kevin LUU, Jeffrey HUYNH, and Chanh Trong HOANG. As is set forth in further detail below,

26 | there is probable cause that MA, HUYNH, LUU, HOANG, Jim Tat Kong (deceased), and Cindy Bao

27 | Feng Chen (deceased) were engaged in a conspiracy to cultivate and distribute marijuana throughout

28 |

California from July 2013 through at least October 17, 2013.  Kong and Chen were killed on October 17, 2013.  I have not included all case details known to me, only those details sufficient to establish probable cause of the violations of the statues listed in Part D of this Section of this affidavit.

**B.    *AGENT QUALIFICATIONS***

3.    I am a Special Agent with the Federal Bureau of Investigation and have been so employed since August 2008. During my employment as a Special Agent, I have participated in numerous drug, financial, and organized crime investigations.  I obtained training at the California Narcotic Officers' Association convention which included detailed instruction in the many aspects of illicit manufacturing and distribution of marihuana, cocaine, heroin, and methamphetamine.  I have also obtained training at the Attorney General's Money Laundering conference which included detailed instruction on money laundering activities.  During these investigations I have gained expertise in law enforcement techniques including the use of physical surveillance and electronic surveillance techniques such as Title III wiretaps, pen registers and traps, pole cameras, and global positioning satellite tracking devices.  I have experience in the use of undercover agents and informants to collect evidence with body recorders and transmitters.  I have experience analyzing toll records, financial records, and utility records.  The investigations on which I have worked have resulted in the arrests of multiple individuals and the seizure of a variety of items of evidence.  I am presently assigned to the San Francisco Field Office of the FBI Asian Organized Crime Squad.  As part of my duties within this unit, I investigate violations of federal law, including narcotics trafficking, violent crimes, racketeering, and money laundering committed by Asian organized crime groups.  I also speak some limited Cantonese, enough to perform basic translations.

4.    As a result of my experience, I have encountered and become familiar with the day-to-day operations and the various practices of individuals involved in organized crime.  I have also consulted and discussed these types of investigations with numerous agents, officers, and attorneys who are experienced in investigations involving organized crime.

5.    I have participated in two investigations involving the interception of communications pursuant to Title III.  As a result of this experience, I am familiar with the use of wiretaps as an investigative technique.  I have also been an affiant on numerous search warrants.

2

6.      I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

7.      I am making this affidavit in support of a complaint for the issuance of arrest warrants for the Targets included in Part C of this Section of the affidavit, for violations of the Statutes included in Part D of this Section of the affidavit.

### C.   COMPLAINANT

8.      **Wing Wo MA** (hereinafter MA) is a 49-year old permanent resident of the United States who is believed to reside in Oakland, California.  MA is believed to be involved in the illegal cultivation and distribution of marijuana.  MA is believed to have directed Kevin LUU to help manage an outdoor marijuana cultivation operation in Mendocino County.  MA is also believed to be involved in the double homicide of Jim Tat Kong and Cindy Chen (hereafter Kong and Chen, respectively).  Kong and Chen were believed to be in partnership with MA in the illegal cultivation and distribution of marijuana.

9.      Criminal History: April 24, 2001, MA was arrested in San Rafael, California for a misdemeanor, driving in excess of 100 mph, MA was convicted of the misdemeanor and fined. February 26, 2002, MA was arrested in San Rafael for felony pimping, MA was convicted of a misdemeanor, Keeping/living in a house of ill fame and was sentenced to 45 days in jail and 3 years probation. July 18, 2008, MA was arrested in Ukiah, California for a misdemeanor California Fish and Game violation 2002-29, 15(C) FG, MA was convicted for the misdemeanor and sentenced to 5 days in jail and 2 years probation. April 30, 2009, MA was arrested for misdemeanor possession of a creature illegally taken in Ukiah, California, MA was convicted for the misdemeanor and sentenced 5 days in jail. January 5, 2012 MA was convicted of a misdemeanor DUI, MA was convicted for the misdemeanor and sentenced to 1 day in jail, a fine, and 3 years probation.

10.     **Kevin LUU** (hereafter LUU), is a 29 year old United States citizen who is believed to reside in Oakland, CA.  LUU is believed to be an associate of MA.  LUU was directed by MA to have managed operations at an outdoor marijuana cultivation operation in Mendocino county.  LUU is believed to have invested between $60,000 and $70,000 with MA in a marijuana related enterprise for

1   which MA now owes LUU.  LUU was present in Mendocino County at the time of the murder of Kong

2   and Chen.

3       11.    Criminal History:  March 22, 2008 LUU was arrested in San Francisco, CA for carrying a

4   concealed weapon on his person, carrying a concealed stolen weapon, carrying a loaded firearm in

5   public and receiving known stolen property, on April 28, 2009, LUU was convicted of the misdemeanor

6   of carrying a concealed weapon on his person and the misdemeanor of carrying a loaded firearm in a

7   public place and subsequently sentenced to 90 days in jail and 3 years of probation.  June 18, 2008 LUU

8   was arrested for multiple counts of vandalism in San Mateo county, California, on August 5, 2008, LUU

9   was convicted of vandalism less than $400 and sentenced to 21 days of jail and 24 months probation.

10   July 29, 2011 LUU was arrested in San Francisco, California for driving under the influence (DUI), on

11   November 30, 2011, LUU was convicted of DUI in San Francisco County and sentenced to 8 days of

12   jail and 3 years probation.

13       12.    **Jeffrey HUYNH** (hereafter HUYNH), is a 52 year old naturalized United States citizen

14   who is believed to reside in Oakland, California.  HUYNH is believed to assist MA in the construction

15   and operation of various marijuana cultivation operations.  HUYNH admits to being and investor in an

16   outdoor marijuana cultivation operation.  HUYNH was present in Mendocino County the week of the

17   murder of Kong and Chen, but departed the area prior to their murder.

18       13.    Criminal History:  HUYNH has no known criminal history.

19       14.    **Chanh Trong HOANG** (hereafter HOANG) is a 48 year old United States lawful

20   permanent resident who is believed to reside in the Santa Ana, California area.  Prior to the double

21   homicide of Jim Tat Kong and Cindy Bao Feng Chen, HOANG is believed to have partnered with MA,

22   LUU, Kong and Chen in a conspiracy to illegally cultivate and distribute marijuana throughout

23   California.

24       15.    Criminal History:  HOANG was arrested on March 26, 1992 by the Santa Ana Sheriff's

25   Office for burglary, California Penal Code section 459, on July 13, 1992, HOANG was convicted of first

26   degree burglary, California Penal Code 461.1, and sentenced to 270 days in jail and 36 months of

27   probation.  On April 25, 1997, HOANG was arrested by the Santa Ana Sheriff's Office for fighting in a

28   public place (California Penal Code 415(1)), and was convicted on February 11, 1999 of a misdemeanor,

and sentenced to 90 days in jail. On November 16, 1998, HOANG was arrested by the Westminster Police Department for a violation of 1916-3(B) of the California Civil Code, for which HOANG was convicted of a felony on April 5, 1999 and sentenced to 16 months in prison. On November 13, 2014, HOANG was arrested by the Santa Ana Police Department for felony manufacture of controlled substance, felony cultivation and possession of marijuana for sale and there is no current final disposition.

### D.   STATUTES VIOLATED

16.    **Title 21, United States Code, Section 841(a)(1)** provides:

"[I]t shall be unlawful for any person knowingly or intentionally to manufacture, distribute . . . or possess with intent to manufacture, [or] distribute . . . a controlled substance" and penalties depend on type and quantities of controlled substance.

17.    **Title 21, United States Code, Section 841(b)(1)(B)(vii)** provides:

"[A]ny person who violates . . . this section shall be sentenced as follows: . . . In the case of a violation . . . involving . . . 100 or more marijuana plants regardless of weight . . . such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years . . ."

18.    **Title 21, United States Code, Section 846** provides:

"Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

## II.   BRIEF SUMMARY OF PROBABLE CAUSE

19.    As is set forth in further detail below, there is probable cause to believe that MA, HUYNH, LUU, HOANG, Kong (deceased) and Chen (deceased) were engaged in a conspiracy to cultivate and distribute marijuana throughout California from July 2013 through at least October 17, 2013. The facts below show that MA utilized his position as a law enforcement informant to his advantage while engaged in a marijuana cultivation and distribution conspiracy with HUYNH, LUU, HOANG, and the deceased Kong and Chen. Kong and Chen were found murdered in Mendocino county. After the bodies were discovered, MA attempted to continue to use his position as a law enforcement informant, with multiple handlers, to obfuscate his involvement and manipulate the

investigation of the homicides.  The Mendocino County Sheriff's Office case on the murders of Kong and Chen remains open.

20.   The investigation has revealed the following:

a.   MA was involved in the business of building marijuana cultivation operations;

b.   MA used his access as an informant for Alameda county to attempt to manipulate investigations;

c.   MA helped Kong manage the 150 plant marijuana operation at 1401 Road D, Redwood Valley, California (hereafter "Road D") by constructing the Road D operation, directing LUU to collect "rent" from the day-to-day Road D marijuana growers Nevin Chea and Thinh V. Tran, which was taken down by Mendocino County Sheriff's Office in July 2013;

d.   LUU admitted that MA directed him to collect "rent" from Nevin Chea at Road D to be paid to MA, who then paid it to Kong.  Later LUU paid it directly to Kong because Kong believed MA was cheating Kong;

e.   Based on this (and as explained below), I believe that MA was Kong's lieutenant in the marijuana cultivation conspiracy and directed others' actions at Road D, the 150 marijuana plant cultivation operation.  MA actively recruited others (LUU, HUYNH, HOANG) to invest either their money, time, or skills to develop additional marijuana cultivation operations with Kong in the Mendocino county area;

f.   MA admits to working on the Road D marijuana site—although he greatly minimized his role in the operation;

g.   HUYNH admits that he was promised $20,000 to $25,000 for his $3,000 investment in Road D operation by Kong and numerous witnesses have indicated that Road D was a marijuana cultivation operation;

h.   HUYNH admits that he and MA set up the Road D operation;

i.   MA was a partnered with Kong (deceased), Chen (deceased), HUYNH, LUU, and HOANG in a conspiracy to develop other outdoor marijuana cultivation operations in

6

1    Mendocino County, California during the week of October 13, 2013 through October 17,

2    2013.

**III.    STATEMENT OF PROBABLE CAUSE**

*A.    SUMMARY OF INVESTIGATION*

**Mendocino County Marijuana Grow, owned by Kong and Managed by MA and LUU**

21.    In July 2013, based upon a tip from the fire department, the Mendocino County Sheriff's Office investigated a suspected outdoor marijuana growing operation at 1401 Road D, Redwood Valley, California and ultimately seized 150 marijuana plants and 1.55 pounds of processed marijuana.

22.    On July 15, 2013, the MCSO made contact with the occupants at Road D and identified Nevin Chea and Thinh Vinh Tran.  Chea provided consent for the MCSO to search the premises. During an interview, Chea advised that all marijuana on the property was for medical purposes, and that he had medical marijuana recommendations.  Chea advised that 70 marijuana plants on the property belonged to Chea and 68 marijuana plants on the property belonged to Tran.  Chea provided a lease that indicated rent was $3,000 per month and he was renting from Xia Xing Lam.  Tran, on probation for narcotics offenses at the time, during an interview advised MCSO that there were a total of four medical marijuana recommendations posted on the property for Chea, Tran, Kevin LUU, and Jeffrey C. HUYNH.  Tran further advised that 70 plants in one greenhouse belonged to Chea and LUU and 80 plants in another greenhouse belonged to Tran and HUYNH.  A total of 150 marijuana plants and 1.55 pounds of processed marijuana were seized by the MCSO.  Chea and Tran were arrested by MCSO and processed and their cases have been adjudicated.  Chea is currently on court supervised probation from Mendocino county.  Tran completed probation in the first half of 2015.

**October 17, 2013 Murders of Jim Tat Kong and Cindy Bao Feng Chen**

23.    In October 2013, the FBI received information from the Mendocino County Sheriff's Office (MCSO) about a double homicide in Fort Bragg, California.  The two deceased people were identified as Jim Tat Kong and Cindy Bao Feng Chen.  Kong was a subject of an active FBI investigation involving Asian organized crime.  Just prior to the disappearance and discovery of the bodies of Kong and Chen, Kong and Chen stayed at the motel located in Fort Bragg California with multiple individuals, subsequently identified as Wing Wo MA, Kevin LUU,  Jeffrey HUYNH, Chanh

Trong HOANG, and Eric Zhen.  The purpose of the group meeting with Kong and Chen at the motel was to engage in a conspiracy to cultivate and subsequently distribute marijuana.  MA allegedly was provided money by Kong and Chen for the purpose of investing in a marijuana grow operation that MA had described as being located in Mendocino, California.

24.     On October 17, 2013 the Mendocino County Sheriff's Office (MCSO) discovered the bodies of Jim Tat Kong and Cindy Bao Feng Chen, deceased in their vehicle.  The homicide case is still outstanding.

**Motel where Kong and Chen last stayed**

25.     Investigation revealed a connection between the decedents and a motel in Fort Bragg, California.  The motel duty manager was interviewed on October 17, 2013.  The manager was asked if any Asian person had rented rooms over the past couple of days.  The manager advised that a male subject named Ma Wing[1] had rented two rooms and that there were several Chinese people associated with the two rooms.  The manager advised that MA was a frequent customer of the motel and estimated that MA stays at the motel four to five times a year.  The manager advised that MA stayed at the location while he harvested abalone and recalled him advising that he was looking at property to purchase.  The manager provided the following address for MA from registration information: 824 E. 24th Street, Oakland, California, (510) 590-6098.

26.     The manager stated that MA checked into the motel on October 14, 2013 at an unknown time and purchased two rooms of the motel and there were several people in the group, all of whom appeared of Chinese decent.  The manager was unsure of how many occupants were in the rooms but recalled MA had asked for six (6) forks at one point.  The manager believed that MA had been operating a white pickup but was unsure.  The manager also recalled a light bronze colored minivan associated with the group[2].  On October 15, 2013, the manager stated that MA provided her with an American Express credit card over the telephone to continue to occupy rooms at the motel.  On October 16, 2013 at approximately 1300 hours, MA entered the motel and provided the manager with the credit card.  MA

---

[1] "Ma Wing" was later fully identified by the manager as **Wing Wo MA** from his California driver's license photograph.

[2] Believed to be the vehicle in which the bodies of Kong and Chen were discovered.

8

1  told the manager that one room would be checking out on October 17, 2013 and one room would be

2  staying at the motel longer.  On October 17, 2013 at about 0900 hours, the manager received a telephone

3  call from MA who advised that he would be checking out of both rooms and to charge them to his credit

4  card that he had provided.  The manager was unsure of the time they left since they didn't stop into the

5  office, but noted that it was prior to the motel check out time of 1100 hours.

6  **B.      *INFORMATION OBTAINED FROM LAW ENFORCEMENT***

7  **Information from Alameda County Sheriff's Office**

8      27.      On October 21, 2013, the MCSO received information from the Alameda County

9  Sheriff's Office (ALCSO) that Detective Justin Miguel had received information from a confidential

10  informant (CI) concerning the homicide of Jim Tat Kong and Cindy Chen.  In an interview with

11  Mendocino county investigators on October 23, 2013, MA advised that he was the CI that provided

12  information on Kong and Chen to the ALCSO.  As a CI, MA provided the following information to the

13  ALCSO[3]:

14      28.      Kong was a major player in the Chinese underworld who ran several marijuana growing

15  operations in Mendocino County.  Kong had been staying at a motel in Fort Bragg prior to his death.

16  Kong had an outdoor marijuana growing operation located off of Highway 20 in Fort Bragg, and the

17  marijuana grow was 2-3 miles inland from Highway 1 and there was a yellow for sale sign and a yellow

18  gate located on the property.  (MA) had provided a tourist map of Mendocino County and had circled an

19  area on the map where he believed the grow was located.  Kong had a crew of 4-6 armed Chinese males

20  working the Highway 20 grow who were likely armed and that one of the men working at the Highway

21  20 location was "Robert[4]" with telephone numbers 415-306-2047 and 415-385-5293.  One of the Asian

22  males staying with Kong at the motel was "Evan"[5] who is associated with telephone number 415-533-

23  6163.

24      29.      Kong had been interested in purchasing property in Mendocino County in order to

25  expand his marijuana growing operations.  Kong had been involved in "ripping people off" of their

---

3 Where MA provides information as a CI through ALCSO, his name appears in parentheses as "(MA)".

4 "Robert" is believed to be "Rabbit" which is a known moniker for **Kevin LUU**.

5 "Evan" is believed to be Eric Zhen

1    marijuana. Kong had been spending more time in Mendocino County because he was in bad standing

2    with some very powerful Chinese gangsters in the Bay Area.

3        30.    Kong had a marijuana growing/processing operation going on at 1401 Road D in

4    Redwood Valley, California (hereafter Road D). The Road D operation was being run by Nevin Chea[6].

5    The marijuana operation off of Highway 20 was wrapping up and all the processing would take place at

6    the Road D address. The 4-6 workers would be leaving the outdoor operation in the next one to two

7    days. The Road D operation would continue to operate[7].

8        31.    On Sunday, October 13, 2013, Kong had gotten into a heated argument with Wu Ze Qin,

9    also known as Tony Wu, at a bar in Oakland. Qin is an enforcer for Kong and his duties include

10    collecting debts. Qin was possibly up in Mendocino County at either the Highway 20 grow or the Road

11    D address[8].

12        32.    The MCSO sent the ALCSO photos of the crime scene, which were shown to (MA).

13    (MA) confirmed that the crime scene was the same location where the Highway 20 crew got resupplied

14    in July 2013. (MA) recognized the location based off the yellow for sale sign and the yellow gate.

15        33.    The ALCSO sent the MCSO California Department of Motor Vehicles images of Qin and

16    of Andrew Li. Li was mentioned by (MA) as an associate of Kong who acts on his behalf as an

17    enforcer.

18    **Interviews of MA's ALCSO Informant Handlers or Translators**

19        34.    Based on my knowledge of this investigation and on facts to be enumerated later in this

20    affidavit, I believe that some information provided by MA to the ALCSO is false and was provided in an

21    effort to obfuscate MA's involvement with Kong and Chen in a marijuana cultivation conspiracy, and

22    minimize MA's involvement and knowledge of Kong and Chen and the resulting murders. This belief is

23    
24        6 This location was the subject of a previous search warrant by the MCSO on July 15, 2013 during which
    Nevin Chea and Thinh Vinh Tran were arrested and approximately 150 marijuana plants and 1.55 pounds of
25    marijuana bud were seized. MCSO had also served a search warrant on this location in 2010 for marijuana related
    crimes.

26        7 On October 23, 2013 a state search warrant was executed at 1401 Road D, Redwood Valley, California.
    During the execution of the warrant, Nevin Chea and Thinh Vinh Tran were again found at the location as they
27    had been during the search warrant in July 2013. The MCSO seized approximately 42 marijuana plants.

        8 No information has been found to corroborate the claim by MA that Qin was in Mendocino County
28    around the time of Kong's death.

1 | based upon the information obtained from the interviews of ALCSO Detective Justin Miguel, ALCSO

2 | Sergeant Oscar Perez, and Retired ALCSO Officer William Lam.

3 |      35.    As set forth in detail below, MA's ALCSO handlers and translators admonished MA not

4 | to handle, cultivate, transport, or sell marijuana.  There were conflicting directions from MA's handlers

5 | and MA's translators due to language barriers, but the direction to MA to not participate in the handling,

6 | cultivation, transport, or sales of marijuana was consistent with personnel from ALCSO.  MA took

7 | advantage of language barriers and miscommunication to leverage and manipulate members of the

8 | ALCSO to further a conspiracy to cultivate marijuana.

9 | **Interview of ALCSO Detective Justin Miguel**

10 |      36.    On June 17, 2015 and October 8, 2015, Detective Justin Miguel, a narcotics detective, of

11 | the ALCSO was interviewed by investigators.  Detective Miguel confirmed that he was a handling

12 | officer for MA in 2013.  Detective Miguel had not been in contact with MA for almost one year.

13 |      37.    Detective Miguel was initially introduced to MA by ALCSO Sergeant Oscar Perez, who

14 | at the time was MA's law enforcement handler, and has provided information to him for the last 3 and a

15 | half years.  Detective Miguel advised that he knew MA had been an informant for the "Feds" in the past

16 | and that MA does not ask for anything in return.  Detective Miguel said MA wasn't asking for leniency

17 | or even for money in exchange for the information he provided.

18 |      38.    Because MA spoke primarily Cantonese Chinese, both Detective Miguel and Sergeant

19 | Perez utilized an interpreter, ALCSO Detective William Lam (retired), to facilitate debriefings with MA.

20 | Though both Detective Miguel and Sergeant Perez were considered MA's primary handlers, MA usually

21 | called Detective Lam first to provide information due to the aforementioned language barrier.  Detective

22 | Lam would contact MA's handler to provide the information.

23 |      39.    Detective Miguel advised that MA's "Get down" is that MA built indoor marijuana

24 | grows and would then provide the information on the marijuana grows to Detective Miguel.  Detective

25 | Miguel stated that MA just showed up with information on marijuana growing operations.  MA was

26 | formally involved in construction trades and had many customers.  If one of MA's customers was

27 | building a marijuana grow, and the operation had a nexus to Alameda county, Detective Miguel's unit

28 |

1   may take on the case.  If there was no nexus to Alameda, Detective Miguel would attempt to pass the

2   information to the appropriate law enforcement entity.

3          40.     MA was never given authorization to break any laws and never instructed to break laws.

4   MA was provided with the typical admonishments that ALCSO gives their informants, which included

5   an admonishment to not handle illegal drugs and narcotics.  Specifically, MA was told not to cultivate

6   marijuana, handle marijuana, or transport marijuana.

7          41.     Detective Miguel advised that MA approached the ALCSO after the double homicide to

8   provide information.  Present at the debriefing was Detective Miguel, Detective Lam, and possibly

9   Detective Miguel's former partner Gus Mora.  Sergeant Perez was not present during the debriefing.

10  Detective Miguel confirmed that MA had showed him on a map where the homicide occurred.

11  Detective Miguel confirmed that he did not direct MA to target Kong. As far as Detective Miguel knew,

12  MA was not directed to target Kong by ALCSO and Detective Miguel was not aware of any cases

13  wherein Kong was a target.

14  **Interview of ALCSO Sergeant Oscar Perez**

15         42.     On September 30, 2015, investigators interviewed ALCSO Sergeant Oscar Perez.

16  Sergeant Perez was previously an informant handler of Wing Wo MA.  Sergeant Perez first met MA in

17  approximately 2010 to 2011 through a now retired Oakland Police Department officer.  Sergeant Perez

18  considered MA to be a model informant.  Sergeant Perez did not recall paying MA.  Sometime in 2012,

19  Sergeant Perez transferred out of the narcotics unit and transferred informant handling duties pertaining

20  to MA to another ALCSO Detective, Justin Miguel.

21         43.     MA provided many investigative leads to the ALCSO pertaining to marijuana cultivation.

22  Most of the information MA provided to ALCSO pertained to marijuana cultivation occurring outside of

23  Alameda County.  MA knew many growers outside of Alameda County.  Sergeant Perez advised that

24  MA was involved in construction of facilities to grow marijuana, and he admonished MA to not get

25  involved in growing or distribution of marijuana.  MA would provide construction services to people

26  intending to grow marijuana, and then provide the locations of the marijuana grow houses to law

27  enforcement.

28

44.     At the time of the Kong and Chen homicides in October 2013, Sergeant Perez was not handling MA, and did not direct MA to target Kong.

**Interview of ALCSO Officer William Lam (Retired)**

45.     On July 1, 2015, and on October 8, 2015, Retired ALCSO Detective William Lam, was interviewed by investigators. Prior to retirement, Lam assisted as a translator for meetings with Wing Wo MA also known as (aka) Mark MA when MA met with his ALCSO handlers. Lam translated for MA meeting from 2011 to approximately November 2013. Usually, due to the language barrier, MA called Lam directly to provide information; Lam was a first point of contact since MA and Lam spoke Cantonese Chinese.

46.     Lam's primary assignment at ALCSO was to investigate property theft. Lam was not assigned to the narcotics unit. Lam assisted the narcotics unit with Cantonese Chinese translations, and was the primary translator for MA. Due to the language barrier, Sergeant Perez and Detective Miguel, MA's handlers for different periods, instructed MA to contact Lam when providing information. Lam was not MA's official handler.

47.     Lam recalled that he first met MA when he was contacted in approximately 2011 to assist with interviewing a subject that had been caught coming out of a marijuana grow house in Oakland or San Leandro. The subject was MA. MA told Lam that he had previously assisted OPD investigators Harry Hu and Warren Young as an informant and also advised he had previously been an informant for the FBI. MA was willing to work for ALCSO and believed that he could be useful. Lam did not have to push MA hard for MA to cooperate and MA was fully willing to work for ALCSO. MA was not prosecuted and began providing information to ALCSO deputies on Kong. Later that same year, MA provided information to ALCSO that resulted in a drug interdiction resulting in a seizure of approximately 200lbs of processed marijuana. This seizure was supposedly related to Kong, but ALCSO did not have any evidence to support this. Lam did not recall if the two individuals in the truck were prosecuted.

48.     MA continued to provide information on Kong to ALCSO. MA provided information on Kong's grow houses. MA attempted to convince ALCSO to install a tracker on Kong's car so that they could follow him to the grow houses. On several occasions, ALCSO provided MA with a tracker device

1  to install onto Kong's car, but MA advised he was unable to install it.  Every time Kong's car showed up

2  for a meeting, Chen would stay in the car.

3      49.    MA worked in the construction business, which gave MA access to people seeking to

4  build marijuana grow houses.  MA would tell ALCSO when a customer requested MA build a grow

5  house.  Lam told MA to build whatever the customer requested, such as walls, planter boxes, plumbing,

6  and electrical wiring, but that MA was forbidden to grow, cultivate, transport, or sell marijuana.  MA

7  would call Lam and provide information without tasking.  MA knew ALCSO was interested in Kong, so

8  MA would call on his own and provide information on Kong.

9      50.    At some point, MA provided information on a large shipment of marijuana from Fresno,

10  California to Alameda county.  The marijuana being shipped was supposed to be from Kong's crew.

11  MA's information was used by ALCSO to stop the shipment and arrest the drivers.  After the

12  interdiction, MA told Lam that Kong had gotten upset at MA and demanded that MA reimburse Kong

13  for the lost marijuana.  Lam believed that Kong was suspicious of MA.  As time went by, nothing ever

14  happened to MA, and Lam thought it was suspicious that if Kong was allegedly a reputable gangster, it

15  was unusual that a person like MA could cross Kong without getting beaten.

16      51.    At some unspecified time, Lam began to not trust MA.  Lam learned from Harry Hu and

17  Warren Young of OPD that MA probably had a crew of guys that was growing marijuana and that MA

18  was diming out his competition.  After MA blew off attempted contacts by Lam, and due to suspicions

19  that MA was working like a double agent, Lam recommended to Sergeant Perez and his supervisor that

20  narcotics unit should consider installing a tracker on MA's vehicle to follow him to his marijuana

21  growing operations.  Lam stated MA was a control problem, untrustworthy, a liar and may have been

22  providing information on competitors.  Lam believed MA was involved in cultivating marijuana himself.

23      52.    As far a Detective Lam knew, no action to track the whereabouts of MA was taken.  It

24  was Lam's opinion that Sergeant Perez and his supervisor wanted to do quick cases, and MA's

25  information was good enough to get leads to develop into quick cases.

26      53.    In the July 2015 interview, Lam advised that he did not believe that MA was tasked to be

27  in Mendocino County during the week that Kong and Chen were murdered in October 2013.  Lam

28  advised at the time he could not remember all the details of what MA reported, but recalled MA telling

1  him he split up from Kong and Chen the morning of and just prior to their disappearance. Lam also

2  recalled MA provided a map and addresses of marijuana grows associated to Kong.  Kong was known to

3  rob his business partners that were also involved in criminal activity.

4       54.    In the October 2015 interview, Lam advised that he remembered that in October 2013,

5  just prior to the homicides of Kong and Chen, MA contacted Lam and advised that Kong was going to

6  Mendocino county to a look at properties he planned to cultivate marijuana on.  Lam told MA to bring

7  back information.  After Lam saw a story on the news pertaining to the murders of Kong and Chen, Lam

8  contacted MA.  Lam called MA and asked what had happened in Mendocino, and that MA must come to

9  ALCSO to debrief.  The ALCSO officers that were present during the interview were Detective Justin

10  Miguel and Lam.  Sergeant Perez was not present.  Lam could not recall who else may have been

11  present at the debriefing regarding Kong and Chen's murder.

12       **C.    STATEMENTS OF PERSONS CONNECTED TO THE CONSPIRACY**

13       **Interview of Wing Wo MA**

14       55.    Wing Wo MA a/k/a Mark MA was contacted at his residence in Oakland, California by

15  investigators on October 22, 2013 at approximately 1630.  MA agreed to be interviewed by investigators

16  and advised that he had previously spoken to ALCSO Detective William Lam, and that MA was

17  expecting the investigators.  MA was transported unrestrained to the offices of the Oakland Police

18  Department in Oakland, California where the interview took place.

19       56.    Prior to the beginning of the interview, investigators advised MA that he was not under

20  arrest.  Investigators read MA his *Miranda* rights and MA indicated that he understood his rights.  MA

21  then provided the following information:

22       57.    MA advised he wanted the interview to be a secret.  MA advised that he works for an

23  Alameda County Deputy named "Oscar" and for Detective William Lam, whose card he previously

24  showed to investigators.  At "Oscar's" request, he has been going to "Mendocino" to work in

25  "marijuana" with Jim (Kong).  MA had been doing this for several months now.  MA provided an

26  address of previously identified Marijuana grow of 1401 Road D in Redwood Valley which was where

27  Kong had a marijuana grow (hereafter referred to as "1401 Road D").  MA has a large garbage trailer for

28  his construction business and Kong wanted him to use the trailer to haul marijuana from Redwood

1  Valley to San Francisco. MA stated that "Oscar" from the ALCSO advised him he could work with
2  Kong for construction matters only and he could not do anything illegal.

3      58.     MA stated that Kong has a lot of marijuana in Mendocino County. MA didn't know if
4  Kong rented or owned the houses in Mendocino County where he has marijuana farms. MA stated some
5  were greenhouses and some were outdoor marijuana grows. MA advised that he informed on Kong.
6  MA had worked with Kong for the last three years and has been providing information to law
7  enforcement. The day prior to this interview, he spoke with Oscar and provided addresses and other
8  information including circling locations on maps. MA stated he installed the water tanks, PVC pipe for
9  the tanks, and green houses at 1401 Road D. MA had recently been to 1401 Road D and he knew one of
10 the kids who lives there as "Nevin." MA stated he provided the information to "Oscar."

11     59.     MA provided an additional address of 656 Finne Road in Redwood Valley, which Kong
12 just purchased this location in cash and MA installed water tanks there. Kong had put 656 Finne Road
13 in someone else's name.

14     60.     With regard to other locations in Mendocino County, in July 2013 MA helped Kong
15 deliver supplies to a location on Highway 20. MA stated he delivered 60 2x4 boards, large rolls of black
16 plastic and PVC pipes, MA described the location as around "2 miles" from Highway 1. MA
17 specifically described this location as having a yellow pipe gate. MA dropped the items off at the gate
18 and nobody was there other than Kong. MA did not know if anybody picked it up. It should be noted
19 that MA was describing perfectly the location where Jim Kong and Cindy Chen were murdered, the
20 Bark Dumps at 30100 Highway 20.

21     61.     Three to four months ago MA saw Kong with 24-25 trays of small plants. MA advised
22 that this should have amounted to over 3000 plants for an outdoor marijuana grow. MA believed these
23 trays went to the Highway 20 location.

24     62.     MA stated that he was last in Fort Bragg the previous Monday, (October 14, 2013).
25 When asked what he was doing in Fort Bragg, MA advised that the Sunday before (October 13, 2013)
26 MA met with Jim Tat Kong, Cindy Chen, a Male named Robert (later identified as Kevin LUU),
27 Robert's girlfriend, a Male Vietnamese man named "Sunny" (later identified as Chanh Trong HOANG),
28 and Jeffrey Huynh in a bar in Oakland. While in the bar, Cindy Chen received a telephone call from a

16

person MA believed to be Tony WU who MA described to be a "follower" of Kong. A short time later, WU arrived and Kong exited the bar to speak with him. When he came back in the bar, Kong was angry as if he had gotten into an argument with WU. Kong came back in the bar and returned to the private room they were in. WU then came in the bar and tried to come in the private room and he was refused entry. That night Kong asked MA to come to Fort Bragg with him the following day to look at some property to build houses on. MA agreed.

63.     The following day (Monday, October 14, 2013), MA drove himself in his white Ford pickup to Fort Bragg and met with Kong, Chen, HUYNH, LUU, HOANG, and a young Chinese Male he knew as "Alvin" (later identified as Eric Zhen) at a motel where MA rented two rooms. MA provided phone numbers for all the persons, and he stated that "Robert" was a Hop Sing Tong guy, who used to follow "Ha Jai" (Raymond "Shrimp Boy" Chow).

64.     MA advised that Kong wanted to buy land by Highway 1 across from the McDonald's restaurant, and planned to divide the lot into four houses. MA's role was to evaluate the land for a planned construction. MA brought HUYNH, his construction business partner, with him to see the land.

65.     Kong took MA to see three more properties. MA was not able to provide very good locations for the additional properties: One was a two unit commercial lot on Highway One south of Fort Bragg and one was a large lot with two houses. Kong wanted MA to help set up for Marijuana grows by doing the construction for the structures only.

66.     Kong had a real estate professional in Daly City who helped Kong buy property. MA didn't know the name and had met the real estate professional one time. MA advised that the real estate guy called Kong "Dai Lo," meaning Big brother in Cantonese-Chinese.

67.     MA advised that all of the persons (LUU, Zhen, HUYNH, HOANG, and MA) except Kong and Chen stayed at the motel Monday night. Kong and Chen went back to San Francisco after the group all went to dinner. MA attempted on Monday night to follow Kong to see where he was going, and Kong caught him. MA advised that he thought Kong was going to a marijuana farm.

68.     On the morning of Tuesday, October 15, 2013, MA said he went back to Oakland arriving at approximately 1030 hours, with HOANG. Kong later called MA and asked him to meet him at a Starbucks Coffee house in Oakland. Kong asked MA to meet him and MA had to shower first as he

17

was tired.  When MA met with Kong, Kong asked MA to drive him back to Fort Bragg in MA's truck.  They arrived at the motel Tuesday night.  MA and Kong were going to share a room; however, Kong had a snoring problem.  LUU and Zhen were still at the motel sharing a room, and MA suspected they were "security" for Kong's marijuana farm.  MA approached LUU and asked if he could sleep in LUU's room.  LUU agreed and stayed in Kong's room.

69.    On the morning of Wednesday, October 16, 2013 at 0630 hours, Kong woke everybody (MA, LUU, and Zhen) up.  Kong took MA to Starbucks coffee shop in Fort Bragg and LUU and Zhen did not go.  Kong and MA were at Starbucks for 2 to 3 hours while Kong took the time trying to convince MA to join Kong's "Marijuana Corporation."  MA explained that his role would only be construction and that Kong would have a lot of money to buy land as long as MA did the construction.  MA agreed under the premise that he only did construction and nothing illegal.

70.    After the meeting at Starbucks, Kong and MA went back to the motel.  Later on the same day, Cindy Chen came back to Fort Bragg, alone.  That Wednesday night, MA said he rode in Chen's van when they went to eat at a restaurant near Motel 6 in Fort Bragg.  The group then went back to the motel after dinner.

71.    Later, Kong told MA that Kong was going back to the City, however Kong returned to the motel with Cindy.  MA heard Kong outside talking on the phone for a half hour and when he came back inside he was angry.  After the phone conversation Kong stated he was staying and not leaving.  That night, Kong and Cindy slept in room 128, and LUU and Zhen slept in room 129.  MA said he slept in room 127 which he found was unlocked.  MA did not pay for room 127.

72.    MA mentioned that he knew the owner of the motel well and he mentioned a project he was working on called "Fort Bragg Resort" with a website of Fortbraggresort.com. MA stated that he was trying to buy 110 acres in Fort Bragg to make the resort and he had investors from China backing him.

73.    MA advised that he last saw Kong around 0600 hours on Thursday, October 17, 2015, in the morning at the motel.  At that time, Kong and Cindy Chen were leaving, allegedly going home. MA advised he had a feeling Kong wasn't going home and stated he felt Kong was going to a marijuana farm on Highway 20.

74.     MA advised that Kong was a dangerous guy. MA was asked if he had heard anything about Kong or from Kong in the last week as he had yet to mention anything about Kong's death. MA said he had not. MA was asked what he would say if he was told him that Kong was dead, and MA acted as if he didn't understand and he looked to the translating agent for clarification. MA then stated he learned Kong was dead "yesterday."

75.     MA was asked how he knew, MA didn't answer, and he stated that the previous Friday (October 18, 2013), Kong's partner "Paul" (later identified as Paul Ancejima) called and wanted to meet. It was Ancejima who told MA that Kong was missing. Ancejima asked who was with Kong in Fort Bragg and MA stated he told Ancejima the same names he told investigators in the present interview.

76.     MA advised that the morning he last saw Kong, he suspected Kong wasn't really going back to San Francisco. MA tried to follow Kong from the motel and Kong caught him. While MA was following, Kong stopped on the highway and confronted MA. MA advised that where Kong stopped was not the location where Kong and Chen's bodies were later found. Kong told MA to go back to the location where they were going to build the four units and get the phone number for the real estate office off the sign. MA felt Kong was just trying to stop him from following him.

77.     **I believe this conduct demonstrates probable cause for a violation of Title 21, United States Code, Section 846 by Wing Wo MA, Kevin LUU, Jeffrey HUYNH, and Chanh Trong HOANG.**

### Interview of Kevin LUU

78.     Kevin LUU was interviewed by investigators on October 25, 2013 regarding the murder of Kong and Chen. LUU provided the following information:

79.     On the afternoon of October 13, 2013, LUU met with four individuals at a Starbucks in Oakland, California. The individuals were known to LUU as "Mark Ma" or "Fat Mark" (known aliases for MA), Jeffrey HUYNH, Jim Tat Kong, and an individual known to him only as "Sunny" (later identified as Chanh Trong HOANG). HOANG was described as a friend of MA's who traveled to the Bay Area from Orange County or Los Angeles.

80.     LUU said MA and HOANG were at the location when he arrived and Kong arrived a short time later.  During the meeting at Starbucks, MA and Kong separated themselves and spoke privately.  LUU was initially unsure of the purpose of the meeting other than to introduce HOANG and make dinner plans later.  LUU was told by MA and Kong that they would be going out for dinner and drinks later and then four of them were going to Fort Bragg on the following day (October 14, 2013), stay for three nights and that LUU and HUYNH would be trimming marijuana.  LUU was told there would be another individual who was unknown to LUU who would be going.  LUU was told that this individual was "Jim's guy".

81.     When asked how he knew the above subjects, LUU said he met MA through a mutual friend about four years prior.  LUU didn't start talking and doing business with MA until earlier in the year 2013.  LUU is employed by MA to complete small errands and jobs for cash.  LUU noted that MA asks him to do things frequently but rarely pays.  LUU believed MA and Kong were business partners.

82.     LUU met Kong in March of 2013 through MA.  LUU said that he hasn't really spoken with Kong much.  The relationship primarily consists of MA calling LUU and directing him to run errands for Kong.  LUU gave the example of collecting rent.  He would be called by MA and sent to a location.  LUU would collect the rent and then give the money to Kong.

83.     LUU said the above mentioned meeting at Starbucks was only the second time he had met HOANG.  The first time LUU met HOANG was in February of 2013.  LUU believed that HOANG's purpose in the trip to Mendocino County was to view the marijuana operation.  LUU believed that Kong didn't know HOANG very well and that HOANG was a business partner of MA.

84.     On October 14, 2013 at about 1000 hours, LUU received a call from MA[9] who stated that he and HOANG would be leaving at about 1030 hours and they would meet at a restaurant in Cloverdale.  LUU said that MA and HOANG traveled in MA's pickup, described as an old, beat-up white pick-up, which was pulling a black boxed trailer.  MA and HOANG were at the restaurant when

---

9 Toll records indicate a call from the **MA's** telephone to **LUU's** telephone, 415-697-9915, on October 14, 2013 at approximately 10:29 a.m. with a duration of approximately 1 minute and 22 seconds.

1    LUU arrived. Kong, Chen, and HUYNH were also present. LUU said that "Kong's guy[10]" arrived a

2    little later. LUU assumed Zhen was brought to "keep an eye on me."

3        85.      After eating and filling up with fuel, Kong and Chen followed MA's vehicle. LUU was

4    told some of the group "were going to check out some stuff" and left traveling on Highway 128 from

5    Cloverdale. LUU assumed they would be looking at MA's marijuana operation. MA left in his pickup

6    with Kong and Chen following in the minivan. LUU and Zhen were instructed to travel to a motel in

7    Fort Bragg. HOANG traveled in LUU's vehicle with Zhen and HUYNH traveling in their respective

8    vehicles. At approximately 1600 hours LUU and HOANG met with HUYNH in the vicinity of the

9    motel. A short time later, LUU received a call from MA[11] who advised that the group had arrived and

10    checked into the motel. LUU drove to the motel and unloaded his belongings into a room.

11        86.      LUU assumed that he was going to start trimming marijuana but was told "the people are

12    already done working for the day." LUU asked Kong if he saw MA's garden earlier in the day. Kong

13    said he didn't see it and he would talk to LUU about it at a later time.

14        87.      Following dinner at 2000 hours, at approximately 2300 hours HUYNH departed and

15    drove back to Oakland. Kong and Chen also departed to drive back to the Bay Area.

16        88.      On October 15, 2013 at about 0700 hours, LUU woke up and found that MA and

17    HOANG had already left the motel. MA drove HOANG and said he was going to take HOANG to the

18    marijuana garden then back to a motel in Oakland where HOANG had left his vehicle. HOANG was

19    going to return to Southern California and MA was going to return to the motel. LUU was under the

20    impression that HOANG was going to be the buyer for the marijuana and had come up there to view the

21    operation.

22        89.      LUU was told by MA that someone would be by the motel to pick them up and take them

23    to the marijuana grow to trim. After a trip to purchase camping equipment for Zhen, LUU and Zhen

24    returned to the motel to wait for either MA, Kong, or a Cambodian male called "K" to come and pick

25          10 **LUU** described the vehicle driven by "Kong's guy" as a white Nissan hatchback which is the same

26    vehicle Zhen described renting for his trip to Mendocino County. **LUU** also stated that "Kong's guy" was known
   to **LUU** as "Evan". **LUU** later identified a California Department of Motor Vehicles photograph of Eric Zhen as

27    "Evan".
        11 Toll records indicate a call from the **MA**'s telephone to **LUU**'s telephone, 415-697-9915, on October

28    14, 2013 at approximately 5:09 p.m. with a duration of approximately 17 seconds.

them up.  LUU had no idea where the garden was and believed "K" was responsible for tending to the garden.  LUU said MA and Kong knew who "K" was and HUYNH met him about three years prior.

90.     At approximately 1600-1700 hours, MA and Kong arrived back at the motel in MA's pickup without the trailer attached.  MA again told LUU and Zhen that the people tending to the garden were done for the day and they did not need any help trimming.

91.     On October 16, 2013 at approximately 0700 hours, Kong and MA departed for breakfast and LUU and Zhen remained at the motel.  MA and Kong returned to the motel at approximately 1300-1400 hours.

92.     At approximately 1700 hours, Chen returned to the motel.  LUU asked MA and Kong about the trimming job.  They told LUU not to worry about it and that he would still be getting paid for the trip.  At approximately 1900-1930 hours MA and Kong left the motel to look at something and returned at approximately 2200-2300, telling LUU that they did not see anything.  LUU said that Kong and Chen had plans to leave Fort Bragg that night after "checking on stuff" due to Chen's birthday the following day.

93.     On the morning of October 17, 2013, MA instructed LUU to wait at the motel.  MA instructed LUU not to leave until HUYNH arrived at the motel to take his place with the trimming job.  LUU learned that HUYNH was supposed to come take his place and HUYNH and Zhen were to stay and complete the trimming job.  LUU said that MA then left the motel and drove back to Oakland.

94.     At about 0900-0930 hours, MA called LUU on his cellular telephone.[12]  MA instructed LUU and Zhen to pack up the remaining belongings in the room, to leave the motel and to drive back to MA's residence in Oakland.  LUU and Zhen took showers and left the motel.

95.     Investigators confirmed with LUU that he and Zhen were hired to trim marijuana in a garden and to act as guards as well.  LUU was asked if he observed anyone with firearms, marijuana, or large amounts of cash.  LUU denied observing anyone.

96.     LUU noted that he had seen MA with a firearm about a month prior.  LUU said he and HUYNH were at MA's residence on 24th Street in Oakland when MA handed LUU a handgun and asked

_____

12 Toll records indicate a call between the **MA**'s telephone and **LUU**'s telephone, 415-697-9915, on October 17, 2013 at approximately 8:55 a.m. with a duration of approximately 1 minute and 56 seconds.

1  if they know where MA can purchase a few firearms.  LUU thought it was to arm people in the Fort

2  Bragg marijuana garden.  LUU described the firearm as a black semi-automatic handgun that he

3  "played" with for a short period.  LUU said it was the first and only time he ever knew MA to possess a

4  firearm.

5       97.     LUU admitted he was aware of the marijuana grow located at 1401 Road D in Redwood

6  Valley as well as knowing the two subjects tending to the marijuana garden.  LUU admitted that

7  "Nevin[13] and "Anthony" pay their rent money to him (LUU).  LUU described the property as belonging

8  to Kong but it is managed by MA.  LUU said MA directed him to drive to Redwood Valley, collect

9  $1500 rent from Nevin and Anthony and then give the money to MA who would in turn give the money

10  to Kong.  At some point there was an argument between MA and Kong where Kong accused MA of

11  skimming rent money.  Kong then instructed LUU to keep collecting the rent money, but instead of

12  giving the rent money to MA, Kong told LUU to give the money directly to him.

13       98.     LUU advised that MA had described the marijuana garden as one large garden that

14  contained numerous smaller gardens.  LUU thought it had been described as about a 10-15 minute walk

15  from the road but didn't know what road or where.  LUU said he, HUYNH, and Paul Ancajima feel like

16  they may have been scammed and that MA never had a marijuana garden.  MA has a reputation of being

17  "dishonest" and a "scam artist."  LUU provided the example that MA had told everyone while in Fort

18  Bragg that he had taken HOANG to the garden before taking him back to his motel in Oakland.

19  HOANG had told LUU while at the motel that this had been his third trip to Fort Bragg to view MA's

20  marijuana operation and he had never seen any grow site or marijuana.  After Kong failed to return from

21  the trip, Ancajima contacted HOANG and asked if MA took him to the garden on the way back to

22  Oakland.  HOANG said it was another trip to Fort Bragg where he never saw any marijuana from MA.

23       99.     LUU was asked what type of guy Kong was and how he would react if MA had been

24  lying to him about a large marijuana operation.  LUU said Kong was known for "straightening

25

26

---

27      13 "Nevin" is believed to be Nevin Chea who was present at the 1401 Road D location during two search
warrants conducted by the Mendocino County Sheriff's Office at that location in July 2013 and October 2013

28  during which marijuana plants were recovered.

1 everything out.  He would hunt Mark down and make him cover the losses.  That's what he's known

2 for."

3 **Subsequent Interview of Kevin LUU**

4     100.    On January 9, 2014 investigators re-interviewed LUU.  LUU provided the following

5 additional information:

6     101.    Investigators reviewed the information previously provided by LUU during the interview

7 conducted on October 25, 2013.  At one point during the interview LUU admitted that he was only

8 providing 85% of the information he knows.  LUU advised the investigators that the 15% he did not

9 disclose is not anything to do with the homicide.

10     102.    LUU reviewed the events that occurred in Mendocino County in October 2013.  LUU

11 confirmed that he was employed by MA in October 2013, and had traveled to Fort Bragg with Kong and

12 MA for the purpose of trimming marijuana as MA's employee.

13     103.    LUU was asked several clarifying questions including questions about the firearms he

14 had seen at MA's residence.  LUU initially stated that he had not touched the firearms, but was

15 reminded by investigators that he had admitted to handling a handgun during the previous interview.

16 LUU was hesitant to admit handling a firearm as he is a convicted felon.

17     104.    LUU then advised that MA had the handgun along with several others for "protection."

18 LUU stated that MA told him the handgun and others were to be brought to Mendocino County for

19 protection at the marijuana farm.  LUU advised that MA specifically told him the gun and others were

20 going to Mendocino.  LUU stated he did not see the guns again, specifically when LUU went to Fort

21 Bragg.  LUU then stated that MA had asked him about trying to obtain additional weapons, specifically

22 AK-47's.[14]

23     105.    LUU stated that the firearm he handled at MA's was a black, semi-automatic handgun

24 which he thought might be a Glock.  LUU then volunteered that MA claimed the guns came from a law

25 enforcement contact.  LUU stated that he thought the guns were prior law enforcement service weapons.

26

27 

28     14 The AK-47 is a Soviet-designed assault rifle which is normally fitted with a 30-round detachable magazine.

106.   LUU advised that MA is currently very paranoid of law enforcement.  When asked for specifics, LUU stated that when he has gone to MA's house or to a meeting with MA, MA does not allow LUU to possess his cellular phone and MA has even gone so far as to "pat down" LUU looking for a recording device.

107.   When asked about money that MA reportedly owed LUU, LUU initially tried to claim that the money MA owed him was for work he (LUU) had done.  When pressed by investigators, LUU admitted to being untruthful and advised that MA owed him between $60,000 and $70,000.  LUU claimed that he provided marijuana to MA which MA shipped out of state.  MA was supposed to provide money back to LUU (proceeds from the sale of the marijuana), but MA claimed that the money transporter got taken down by law enforcement and that the money was seized.  LUU stated that he is on the hook to someone else for the marijuana which was provided to MA, so LUU is maintaining contact with MA to press him about paying LUU back.

108.   When asked about HOANG, LUU stated that MA is the main person who knows HOANG, however LUU had personally spoken with HOANG on the phone a couple of days after the homicide.  When asked why, LUU stated that he and Jeffrey (HUYNH) got together and called HOANG to try and verify the initial story MA had told them about a marijuana robbery.  LUU stated that he asked HOANG if he had ever seen the outdoor marijuana operation in Fort Bragg and HOANG claimed he had not.  LUU further stated that HOANG supposedly came to Fort Bragg to view marijuana before he purchased it.  LUU provided a cellular telephone number for HOANG of 714-769-0973.

**109.   I believe this conduct demonstrates probable cause for a violation of Title 21, United States Code, Section 846 by Wing Wo MA, Kevin LUU, Jeffrey HUYNH, and Chanh Trong HOANG.**

**Interview of Jeffrey HUYNH**

110.   Jeffrey HUYNH was interviewed by investigators at the San Francisco Office of the FBI on October 25, 2013 regarding the murder of Kong and Chen.  Although not in custody, HUYNH was read his "Advice of Rights" prior to the interview.  HUYNH then provided the following information:

111.   On the evening of October 13, 2013, Jim Tat Kong invited several of his friends and business associates to a bar in Oakland, California.  HUYNH, Wing Wo MA, Kevin LUU, and Cindy

Chen were all present. HUYNH has known MA for 20 years. Throughout the night they discussed various construction sites Kong was looking to buy.

112.    On Monday, October 14, 2013, HUYNH drove himself to a motel in Fort Bragg to meet with MA and Kong to talk about construction. Kong was trying to buy four new properties near the ocean and HUYNH has been hired to build the homes and do construction on the land. HUYNH arrived at the motel between 1600 hours and 1700 hours. Present at the motel were Kong, Chen, LUU, MA, "Sunny"[15], and a "young Chinese kid."[16] HUYNH was invited to the meeting in Mendocino County by MA and knew Kong would be in attendance. HUYNH did not know, however, that the other people would be there.

113.    Initially HUYNH advised that he had nothing to do with marijuana: MA sets up jobs for HUYNH but none of them had anything to do with marijuana; MA has never talked to HUYNH about marijuana and HUYNH has never smelled marijuana on any of his business associates.

114.    HUYNH has a general contractor's license and owns a company named Bay Area Plumbing and Construction, Inc. which is located at 3003 Brookdale Avenue, Oakland, California and employed two people. MA was not an employee, but rather sub-contracted jobs to HUYNH.

115.    In addition to Kong's properties, MA offered HUYNH the opportunity to get involved with building a resort in the Fort Bragg community. There are a lot of Asian investors and HUYNH wanted to be part of the project. MA was in control of the project and HUYNH did not know anyone else involved nor did he know anything about it. To date, HUYNH had not put any money into the project and did not know if Kong or any of the other people at the motel had invested money. HUYNH did not know the exact location of the project. MA drove to Mendocino County with HUYNH in the past to view the property.

116.    HUYNH initially advised that he knew MA to be an honest businessman. HUYNH had heard a lot about MA owing people money. MA owed the material supplier, American Emperor, a couple thousand dollars. MA also owed HUYNH $3,000 for materials. HUYNH could not confirm

---

15 **HUYNH** did not know Sunny very well and did not know his real name. Sunny was subsequently identified as Chanh Trong HOANG.

16 Later identified as Eric Zhen.

1  whether or not MA owed Kong money. HUYNH later stated that MA may not be a very good business
2  man.

3      117.    After having dinner together on Monday night, everyone went back to the motel. Once
4  back at the motel, Kong and MA were talking about marijuana while HUYNH watched television.
5  HUYNH did not participate in the conversation. HUYNH was upset because he drove several hours to
6  see the construction sites and now it was too late.

7      118.    After leaving the motel Monday night, HUYNH did not talk to anyone again until
8  Thursday. HUYNH was supposed to drive back to Fort Bragg on Thursday to do construction, however
9  MA called and told him he no longer needed to go.[17] HUYNH and MA were partners in construction
10  and HUYNH did not question MA.

11      119.    There were no firearms as far as HUYNH saw at the motel that evening (Monday,
12  October 14, 2013). HUYNH did not own a firearm and has never seen MA with a gun. HUYNH has
13  never done anything illegal with MA and did not know anything about MA's activities.

14      120.    On Saturday, Kevin LUU called HUYNH[18] and asked if he would meet at Starbucks in
15  Daly City around 13:00 hours. The two men met at Starbucks where they discussed the unknown
16  whereabouts of Chen and Kong. Both LUU and HUYNH made guesses as to what happened to them.
17  Kong has a really bad reputation and tried to cheat people, however HUYNH had never been cheated by
18  Kong. LUU knew of Kong's association with the Hop Sing Tong[19]. HUYNH was not in an association

19  _____

20      17 Toll records indicate a call between **MA**'s telephone 510-590-6098 and **HUYNH**'s phone, 510-301-1600, on October 14, 2013 at approximately 10:24 a.m. with a duration of approximately 4 minutes and 41 seconds. Toll records do not reveal any other contact between the **MA**'s telephone and **HUYNH**'s telephone
21  until October 18, 2013. On October 18, 2013, there were two calls from **MA**'s telephone to 510-301-1600. One call occurred at 12:36 p.m. with a duration of approximately 31 seconds and one call at 12:37 p.m. with a duration
22  of approximately 28 seconds. (Note: There is a discrepancy between the toll records for **MA**'s telephone and 510-301-1600. The toll records for 510-301-1600 indicate the calls occurred at approximately 2:36 p.m. and 2:37 p.m.
23  respectively. The reason for this discrepancy is unknown and is being investigated, but the above analysis relies on the toll information from **MA**'s telephone.)

24      Toll records also indicate the following calls between the **MA**'s telephone and **HUYNH**'s alternate telephone, 707-246-7902, as follows: October 14, 2013 at approximately 12:41 p.m. with a duration of
25  approximately 1 minute and 4 seconds; October 14, 2013 at approximately 5:06 p.m. with a duration of
26  approximately 10 seconds; October 15, 2013 at approximately 12:35 p.m. with a duration of approximately 12 seconds; and October 17, 2013 at approximately 8:58 a.m. with a duration of approximately 12 seconds.

27      18 Per toll record information, **LUU** used telephone number 415-679-9915 to contact **HUYNH**.

28      19 The Hop Sing Tong is a Chinese benevolent association located in the Chinatown district of San Francisco. Kong was known to be extremely active in the Hop Sing Tong prior to his death. There are numerous

1  and did not work with anyone in an association, including MA. HUYNH, however, could not

2  definitively state whether MA was or was not in an association.

3       121.   HUYNH provided investigators consent to search his primary telephone, 510-301-1600.

4  HUYNH advised that he had another phone but he no longer used it and cannot remember the phone

5  number except that it had a 707 area code. He stopped using the phone last Saturday after he met with

6  LUU at the Starbucks. HUYNH threw the phone in the trash because of what happened in Mendocino

7  County and he did not want to get involved. HUYNH only used this phone to talk to MA, Kong, LUU,

8  Michael LNU (a Chinese guy from Oakland), and on one occasion to HOANG. Kong told HUYNH to

9  buy a pay-as-you-go phone for construction. HUYNH then acknowledged that the phone was used for

10  construction related to marijuana. HUYNH later provided his previous secondary telephone number as

11  707-246-7902.[20]

12       122.   HUYNH then admitted to more involvement with marijuana cultivation. HUYNH and

13  MA used Kong's equipment to setup a greenhouse in Mendocino County for marijuana purposes in

14  January. The location of the greenhouse is at 1401 Road D in Redwood Valley.[21] HUYNH has been

15  working towards getting a city permit in Ukiah but has not been able to obtain one. HUYNH heard

16  Kong was going to share the greenhouse with the owner of Road D, but HUYNH does not know the

17  name of the owner.[22] HUYNH had a marijuana license that he obtained in Oakland and was to receive

18  10% of all profits derived from the marijuana grow; Kong, however, held the biggest share. HUYNH

19  was supposed to receive between $20,000 and $25,000 which was a good return since he only invested

20  $3,000. Kong was supposed to pay him the money.

21  

22  members of the Hop Sing Tong who have ties to Asian organized crime. I am aware of a separate FBI
investigation that involves organized crime activity by several subjects who are known to be past and present

23  members of the Hop Sing Tong. This investigation has gathered conversations, both consensually and through
court-authorized interception, that have included discussions regarding Kong's position within the Hop Sing Tong

24  as well as speculation regarding who is responsible for Kong's murder. None of these conversations, however,
have gathered any evidence relating to MA's participation in Kong's murder or the other Target Offenses.

25       20 This telephone appears in toll records as having been in contact with MA's telephone four times from
October 15, 2013 through October 22, 2013.

26       21 As further described in this affidavit, multiple state search warrants have been executed at this

27  property where evidence showed the presence of a marijuana grow.

       22 The owner of the property at 1401 Road D, Redwood Valley, California was identified as Xia Xing

28  Lam (also known as Xia Xing Lin) based on open source property records.

123.    Kong told HUYNH he would receive 35 plants for the use of his marijuana license. Kong brought in two young kids to work the farm, but HUYNH did not know who they are.  The fire department came in July and cut down all the marijuana plants belonging to Road D.  HUYNH never received any profits and was never paid for the cost of setting up the greenhouse.

124.    HUYNH did not have any customers who buy marijuana from him though he has sold marijuana one or two times in the past.

125.    HUYNH became friends with Kong through MA.  At the time HUYNH did not have any business.  They all sell marijuana at a local coffee shop and the cops all know.  HUYNH mentioned knowing a lot of Oakland Police also.

**126.    I believe this conduct demonstrates probable cause for a violation of Title 21, United States Code, Section 846 by Wing Wo MA, Kevin LUU, Jeffrey HUYNH, and Chanh Trong HOANG.**

**Interview of Chanh Trong HOANG**

127.    On July 20, 2015, investigators interviewed Chanh Trong HOANG in the Westminster, California area.  HOANG had previously been identified by Eric Zhen as being "Sunny", a previously unidentified Vietnamese subject who had traveled to Fort Bragg California with Wing Wo Ma and Jim Tat Kong in October of 2013.

128.    HOANG advised he has the nickname "Sunny," and that he was in Mendocino County in October 2013.  HOANG went to Fort Bragg, California, in Mendocino County with MA, in MA's pickup truck, as MA was going to show him some property where they could legally grow "weed." Hoang advised he stayed one night and then came back.  HOANG remembered that the motel was a one story structure.  HOANG advised that MA dropped HOANG off at his car, which was parked at MA's house.  HOANG then drove his car home to southern California.

129.    Since the October 2013 trip to Mendocino county, HOANG exchanged texts with MA for a short period when MA was planning to go to southern California to visit his daughter at college. Whenever HOANG spoke with MA, MA always talked about growing marijuana.  When MA was in southern California, HOANG drove 2-3 hours to meet and talk with MA.  MA spoke about marijuana the entire time during the meeting.

130. While in Mendocino with MA, HOANG met a man and a woman that he believed to be investors. After arriving in Mendocino County, HOANG and MA checked into a motel, then went to dinner with the male and female investors in MA's operation. HOANG never saw MA's operation or the proposed property. MA told HOANG that it was too late that night to go to the property, and the following day, MA advised that it was too foggy to go. HOANG stated that he had seen pictures of the land and his intent was to go to Fort Bragg to "check it out." MA advised HOANG that they would see the property "next time."

131. HOANG advised he was not upset about not seeing the location they specifically came to Fort Bragg to see. HOANG did not know how much the other investors planned to contribute, but HOANG was going to contribute his time and work to the project, as HOANG knows how to grow marijuana. HOANG advised that they were planning to set up for an outdoor marijuana grow the following year during spring. HOANG considered himself to be an investor with MA in MA's operation.

132. HOANG advised that MA never told him about anything bad that might have happened in Fort Bragg. HOANG eventually came to the conclusion that MA was a liar and cheated people, and that HOANG began to "blow off" MA because he believed him to be dishonest.

133. HOANG stated he met MA a little before 2013 and it was all through connections in the marijuana business. HOANG stated that he had done business with MA between 2012 and 2013 and MA gave him marijuana, but did not provide further detail. HOANG never worked with MA after 2013. For two years prior to his trip to Mendocino County, MA talked to him frequently about an investment and after the trip, the talk ended.

134. HOANG advised that he knew the marijuana business well and he knew that most of his investment would be work. HOANG's mutual friend with MA is a person named "Lu" who is from Oakland. HOANG declined to provide additional information about Lu.

135. HOANG was shown a series of California Department of Motor Vehicle photographs of MA, LUU, HUYNH, Zhen, Kong, and Chen. HOANG recognized MA as "Mark"; LUU as "Robert". HOANG believed that photos of Kong and Chen may resemble the investor couple he met in Mendocino. HOANG did not recognize HUYNH or Zhen.

136.     HOANG recognized LUU from the Fort Bragg visit, and also recalled that he met LUU while at MA's house in the past. HOANG has also met LUU in southern California, where LUU provided a marijuana sample to HOANG.

137.     At one point after the dinner, MA pointed out a location where MA was planning to grow marijuana. HOANG did not have further information to the location, as HOANG was unfamiliar with the area.

**138.     I believe this conduct demonstrates probable cause for a violation of Title 21, United States Code, Section 846 by Wing Wo MA, Kevin LUU, Jeffrey HUYNH, and Chanh Trong HOANG.**

**<u>Interview of Eric Zhen</u>**

139.     Eric Zhen was interviewed by investigators on October 24, 2013 regarding the murder of Kong and Chen. Zhen provided the following information:

140.     Zhen first met Kong in approximately July 2011 while working as an employee at Kong's Broadway Street store. Zhen worked at the store until approximately January 2012 when it went out of business and closed. In approximately July 2013 Kong approached Zhen and said that he had legitimate work for Zhen. Zhen's job would be to stay in Mendocino for several days to work. Zhen believed this work to involve construction. Zhen accepted the work offer and was subsequently driven by Kong to Mendocino County in Chen's van.

141.     Once in Mendocino, Zhen was introduced to an individual named "Fat Boy" also known as (aka) "Mark[23]" who Zhen would be working with. Zhen, Kong, and Chen were present at this first meeting with MA. Shortly after the first meeting with MA in July 2013, Zhen traveled up to Mendocino County with MA. The two rode together in MA's white pickup truck. Zhen's job would be to drill holes into the ground at a specific property. MA told Zhen that the work was dangerous and that the holes that Zhen was drilling were for marijuana. Kong also told Zhen that the work would be related to marijuana. Zhen went to the property where the holes were drilled only once. The property was located near Fort Bragg, California and was on a side street off of S. Main Street.

---

23 Zhen positively identified Fat Boy, aka Mark as **Wing Wo MA** from a California Department of Motor Vehicles photograph of **MA**.

142.    Kong told Zhen on two occasions to check on the progress of the marijuana grow and to see if it was a legitimate grow. Zhen attempted to comply with Kong, but was not able to find the marijuana grow. MA transported Zhen to Mendocino on at least two occasions to work on the marijuana grow, but each time MA would leave Zhen in a room at the motel. Each time MA left Zhen at the motel, MA would disappear for several days, one time for as long as three days. Zhen believed that the marijuana grow never existed and MA was trying to stall for additional time.

143.    On Monday, October 14, 2013, Zhen went to Mendocino in a rental car he was told to rent for two weeks. Zhen was told to go to the motel in Fort Bragg. Zhen would be working at the marijuana grow and would be paid at the end. Zhen arrived in the Fort Bragg area on Monday night at approximately 18:00 hours. At the motel were: MA, Kong, Chen, and three men Zhen did not know.[24]

144.    After dinner on Monday night, Kong pulled Zhen aside and told Zhen to discretely check on the outdoor marijuana grow at 05:30 hours the next morning to see if the grow was legitimate. When Kong found out that Zhen did not have proper clothing and equipment to go by himself to the outdoor grow, Kong told Zhen not to go to the grow location. After Monday night, Zhen did not see HUYNH or the unidentified Vietnamese male, believed to be Sunny[25] again at the motel.

145.    At approximately 10:00 hours on October 15, 2013, MA told Zhen that he was going back to Oakland and would return later that night around 18:00 hours with Kong.

146.    On Wednesday morning October 16, 2013, Kong knocked on Zhen's room door and told Zhen to wake up MA so they could get coffee. Kong and MA left for coffee and returned around 14:00 hours. At approximately 19:00 hours Chen returned from the San Francisco area. Chen and Kong stayed in a room together on Wednesday night, LUU and Zhen stayed in their room, and MA was alone in a third room.

147.    Zhen noted that by Wednesday, October 16, 2013, he observed Kong to be not as friendly towards MA in comparison to Kong and MA's interaction earlier in the week.

---

24 Zhen identified **Jeffrey HUYNH** and **Kevin LUU** from California Department of Motor Vehicle photographs as two of these individuals. Zhen identified the final individual as a Vietnamese male who matches the physical description provided by others of Sunny LNU, **MA**'s associate from Los Angeles.

25 Zhen later identified Sunny from a California Department of Motor Vehicles photograph to be Chanh Trong Hoang.

1  148.   On Thursday morning, October 17, 2013 at approximately 08:00 hours, MA knocked on

2  the door of Zhen and LUU's room.  MA asked LUU and Zhen where Kong was and LUU and Zhen did

3  not know.  LUU then called Kong's cellular telephone, but nobody answered.  MA said that MA and

4  Kong were supposed to meet with Mr. K[26] who was going to take them to the marijuana grow[27].

5  149.   On the same day at approximately 09:30 hours, MA called LUU's cellular phone[28].  At

6  this time LUU and Zhen were still in their room at the motel.  After LUU got off the phone with MA,

7  LUU told Zhen that LUU was supposed to return to Oakland and Zhen was to return to San Francisco.

8  Shortly thereafter, LUU and Zhen left the motel to drive back to San Francisco.  Zhen tried to keep up

9  with LUU on the way back, but lost him approximately 20 miles into the trip.  Zhen arrived in San

10 Francisco at approximately 13:00 hours.  Later that afternoon, LUU called Zhen and told him to meet at

11 approximately 18:00 hours.  LUU's voice sounded like it was very urgent.

12  150.   At approximately 18:00 hours, Zhen met LUU.  LUU told Zhen that "some shit happened

13 and it was not safe to stay there [referring to the motel]" and did not further elaborate.  LUU told Zhen

14 that he would call Zhen at a later date and that Zhen should return various items that belonged to LUU

15 or MA.  LUU told Zhen he was giving this stuff back to MA.

16 **IV.   CONCLUSION**

17  151.   Based upon the foregoing, I believe there is probable cause that MA, LUU, HUYNH, and

18 HOANG violated Title 21, United States Code, Section 846.  MA may have been working as an

19 informant for ALCSO, however he violated the agreement with ALCSO to not handle or cultivate

20 marijuana when:

21          a.   MA managed a 150 plant marijuana grow operation for Kong, located at Road D

22               (Paragraphs 58 and 97); and

23          b.   MA provided a marijuana sample to HOANG during the period 2012 and 2013

24  ───────────────

25  26 "Mr. K" was described to Zhen by **MA** as a Cambodian military guerilla who was responsible for guarding the marijuana grow which Kong had instructed Zhen to check on.  Zhen never met Mr. K and believed that Mr. K did not exist.

26  27 The story about **MA** and Kong waiting for Mr. K to take them to the marijuana grow is inconsistent with the statement provided by **MA** to investigators on October 22, 2013.

27  28 Toll records indicate a call between the **MA**'s telephone and **LUU**'s telephone, 415-697-9915, on

28 October 17, 2013 at approximately 8:55 a.m. with a duration of approximately 1 minute and 56 seconds.

1   (Paragraph 133); and

2       c.  MA took $60,000 to $70,000 worth of marijuana from LUU for shipment to the east

3           coast of the United States (Paragraph 107);

4       d.  LUU, HUYNH, and HOANG all traveled to Fort Bragg, California during the week of

5           October 13 through 17, 2013 for the purpose of engaging in a conspiracy to cultivate

6           marijuana with MA, Kong, and Chen.

7       152.    Based upon the foregoing, I believe there is probable cause that MA and LUU, violated

8   Title 21, United States Code, Section 841(a)(1)(B)(vii) by sharing management of the 150 plant

9   marijuana cultivation operation at the Road D location (Paragraphs 58, 97).

10       153.    Based on the foregoing, I request that a Criminal Complaint issue for the Target listed in

11   Part B of Section I of this Affidavit, based upon Probable Cause as described in Section II of this

12   Affidavit. In summary, as follows:

13

| Defendant | Offense | Penalty |
|---|---|---|
| MA | 21 USC 841(a)(1)(B)(vii); 846 | From 5 to 40 years; 4 years supervised release; $5,000,000 fine; $100 assessment |
| LUU | 21 USC 841(a)(1)(B)(vii); 846 | From 5 to 40 years; 4 years supervised release; $5,000,000 fine; $100 assessment |
| HUYNH | 21 USC 846 | Up to 5 years prison; 3 years supervised release; $250,000 fine; $100 assessment |
| HOANG | 21 USC 846 | Up to 5 years prison; 3 years supervised release; $250,000 fine; $100 assessment |

26       Under penalty of perjury, I swear that the foregoing is true and correct to the best of my

27   knowledge, information, and belief.

28

David VanderPorten
Special Agent
Federal Bureau of Investigation

SWORN BEFORE ME
ON OCTOBER 21 , 2015.


HON. JACQUELINE SCOTT CORLEY
United States Magistrate Judge

Approved as to form:

William Frentzen
Damali Taylor
Assistant United States Attorneys

35